ORIGINAL

CC
DAE

James H. Fosbinder #7070
IVEY FOSBINDER FOSBINDER LLLC
A LIMITED LIABILITY LAW COMPANY
1883 Mill Street
Wailuku, Hawaii  96793
Telephone:  (808)242-4956
Facsimile:  (808)249-0668
Email:  jfosbinder@iff-law.com

Attorneys for Plaintiffs
ANTONIO PANLASIGUI and LEE-ANN PANLASIGUI

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

MAR 10 2011

at ___ o'clock and ___ m. ___ M.
SUE BEITIA, CLERK

## UNITED STATES DISTRICT COURT
### DISTRICT OF HAWAII

| | |
|---|---|
| ANTONIO PANLASIGUI and LEE-ANN PANLASIGUI, <br><br>              Plaintiffs, <br><br> v. <br><br> BANK OF AMERICA, N.A. and DOES 1 through 20 inclusive, <br><br>              Defendants. | Civil No. **CV11 00155**   DAE   KSC <br><br> COMPLAINT |

Plaintiffs ANTONIO PANLASIGUI and LEE-ANN PANLASIGUI by and through their attorney, JAMES H. FOSBINDER, of IVEY, FOSBINDER, FOSBINDER LLLC, a limited liability law company, bring the following Complaint and allege as follows:

### JURISDICTION AND VENUE

1.   Jurisdiction arises under 28 U.S.C. § 1331 (Federal Question Jurisdiction); the Sherman Anti-Trust Act, 15 U.S.C. §

1

2; the Federal Truth in Lending Act (TILA), 15 U.S.C. § 1601, et.seq., and the Act's corresponding Regulation Z (12 C.F.R. Part 226).

2.   Jurisdiction also arises under 28 U.S.C. § 1332 (Diversity Jurisdiction).

3.   This Court has supplemental jurisdiction over this action under 28 U.S.C. § 1367(a) because state law claims are so related to the federal claims that they form part of the same case or controversy. These claims all arise out of the same controversy and sequence of events. This Court has jurisdiction over state claims asserted under Hawaii Revised Statutes (hereinafter "HRS") by virtue of pendent jurisdiction.

4.   Venue is proper in the United States District Court for the District of Hawaii, pursuant to 28 U.S.C. § 1391, in that Defendants systematically conduct and transact substantial business in this State and District as licensed banks and corporations organized and/or operating in the State of Hawaii, the causes of action occurred in this District, and Plaintiff resides in this District.

## PARTIES

5.   Plaintiffs ANTONIO PANLASIGUI and LEE-ANN PANLASIGUI (the PANLASIGUIS) are and were at all times relevant herein over the age of eighteen and were residents of the County of Maui,

State of Hawaii, and are consumers in regard to credit transactions.

6.    Defendant BANK OF AMERICA N.A. (BOA) is, and was at all times relevant here, a National Banking Association organized under the laws of the United States, and conducting business within the State of Hawaii.  BOA is the successor in interest to Countrywide Home Loans, Inc.

7.    The acts or omissions of Defendants alleged in this Complaint were performed by their agents, officers, affiliates or employees within the scope of their actual or apparent authority which were known or should have been known to Defendants or their predecessors in interest, and are imputed to Defendants.

8.    DOE Defendants 1-20, inclusive, are various individuals, partnerships, associations, corporations, and other entities claiming any legal right, title, estate, lien, or interest in the Subject Property, as described adverse to Plaintiffs' interests. Plaintiffs will make a good faith effort to determine the true names and identities of these parties. Plaintiffs reserve the right to amend this Complaint to add such parties as their true identities and capacities are ascertained through discovery or otherwise.

9.    Defendants operate mortgage originating and mortgage servicing businesses that solicit, cater, and service millions

of home loans annually.  Based on understanding and belief,

certain Defendants and their agents, officers, affiliates and/or

employees have operated as a common enterprise while engaging in

the unlawful acts and practices alleged below. Because

Defendants have operated as a common enterprise, each of them is

jointly and severally liable for the acts and practices alleged

below.  Additionally, because any acts and/or omissions were

performed by Defendants' agents, officers, and/or employees

within their scope of their actual or apparent authority, which

were known or should have been known to Defendants or their

predecessors in interest, are imputed to Defendants.

## ECONOMIC BACKGROUND TO THIS COMPLAINT[1]

**Traditional Role of Banks**

10.   The role of banks has changed dramatically in the last

two   decades.  Since   the   1930s,   residential   mortgages   were

conventional  products:  long-term,  fixed-rate,  "prime"  mortgages,

meaning  the  underwriting  criteria  were  strictly  followed.  The

borrower  was  credit-worthy,  he  or  she  had  the  income  to  repay

the  debt,  and  the  value  of  the  real  property  sufficiently

protected  the  lender  in  case  of  default.  Banks  had  a  vested

---

[1] The economic processes that have given rise to this Complaint
involve complex financial schemes and esoteric terminology.  For
this reason, Plaintiff respectfully requests that this Court
allow general background information in order to clarify the
economic reality of these financial arrangements.

interest in ensuring that the loans they made were sound products and that borrowers can and would repay the loans because banks either held on to the loans they made or sold them on the secondary market to Fannie Mae and Freddie Mac, which were sponsored by the federal government to provide liquidity in the housing market. These entities had strict "conforming" standards for the loans they were allowed to buy.

11. In 1993, there were only 24,000 subprime mortgages (where the borrower does not meet standard underwriting criteria) used to purchase homes, with 80,000 subprime refinance loans. Prime purchase mortgages numbered 2.2 million, and 5.2 million prime refinance loans. In other words, there were 70 prime loans for every subprime loan.[2]

**Securitization and Mortgage-backed Assets**

12. In 1968, Ginnie Mae began securitizing mortgages, that is, buying mortgages from lenders, combining them into pools, and issuing securities backed by these mortgage pools. These "mortgage-backed securities" (MBS) each had a claim to a small

---

[2] Simon Johnson and James Kwak, "13 Bankers: The Wall Street Takeover and the Next Financial Meltdown" (2010), at p. 127, citing HDMA data gathered by the Federal Financial Institutions Examination Council, matched with the HUD list of subprime lenders; cited in Kenneth Temkin, "Subprime Lending: Current Trends and Policy Issues," The Neighbor_Wors Journal, Spring-Summer 2000, available at
http://knowledgeplex.org/kp/text_document_summary/article/relfil es/partner_content/nrc/ht_nrc_temkin.pdf.

piece of each mortgage. The risk of default of one loan was spread over the large numbers of investors. The U.S. government, through Ginnie Mae, guaranteed the principal on the mortgages.

13.   The Secondary Mortgage Market Enhancement Act of 1984 laid the way for present-day securitization by sidelining the tax and state regulations that previously prevented banks and other entities from doing so. Investment banks could now buy mortgages, pool them, and divide them into "tranches" (divisions of risk) and sell them to investors. Banks could now make money multiple ways: originating mortgages, creating securitizations, earning fees selling MBS to investors, and trading securities. Securitization meant that loans could be resold on Wall Street, and mortgage origination became fee and volume driven.

14.   Mortgage securitization involves the conversion of illiquid whole loans into bond-like instruments that trade in capital markets. Mortgage loan "pass-through" securities entitle the investor to payments from pools of mortgage loans, i.e., when borrowers make payments on the underlying mortgages, the cash flow is pooled and "passed through" to the investors.

15.   Mortgage-backed securities (MBS) are typically created by the originating lenders selling the mortgage loans to a "special purpose vehicle" ("SPV"). SPVs are typically US-style trusts established specifically to facilitate the

securitization. The SPV may hold the mortgage on its balance sheet or place it in a separate trust.

16. To transfer the pool of loans to a trust, the originating lender (called a "Seller" in MBS parlance) sells the loans to a Depositor, who then transfers – or "deposits" the acquired pool of loans to an "issuing trust."

17. Whether held by the SPV or sold into a trust, the rights to the cash flow are sold as bonds to investors, and the originating lender is paid off.

18. Mortgage securitization directly led to the "originate to distribute" model of mortgage lending, with originating lenders increasingly more concerned with generating loans to sell the mortgages for securitization than they were with selling borrowers loans they could actually afford. Originating lenders did not have to wait 30 years to be repaid; they were repaid almost before (and in some cases well before) the ink was dry on the contracts. The risk of default was effectively passed to the investors, who may or not have known the risks they were exposed to. Underwriting criteria – whether a borrower was qualified for a loan – simply ceased to matter. The problem is that no one bothered to warn the borrowers.

19. Waves of "innovation" in subprime lending lured borrowers into subprime (also now called "toxic") mortgages, which in turn fed the lucrative securitization machine. "Alt-A"

loans were the moniker given to higher-end subprime mortgages. Other products promised the American Dream: adjustable-rate mortgages ("ARMS") with fabulous low-interest "teaser" initial rates and "pay option" mortgages where borrowers could choose to pay less than the monthly interest on their loan, so the principal would go up, not down. Lenders made money originating loans; then, when the interest rates reset and borrowers couldn't afford the payments, they made money on re-financing.

## Consolidation and Growth of Top-Tier Financial Institutions

20.   With the mortgage industry booming, large banks began acquiring subprime lenders. Among the top 25 subprime lenders, First Franklin was bought by National City and alter by Merrill Lynch; Long Beach Mortgage was bought by Washington Mutual; Household Finance was bought by HSBC; BNC Mortgage was bought by Lehman Brothers; Advanta was bought by JPMorgan Chase; Associates First Capital was bought by Citigroup; Encore Credit was bought by Bear Stearns; and American General Finance was bought by AIG.[3] Not only did the big banks want the fees

---

[3] Simon Johnson, "13 Bankers," Id. at page 128, citing Alyssa Katz, Our Lot: How Real Estate Came to Own Us (New York: Bloomsbury, 2009), 70; Center for Public Integrity, Who's Behind the Financial Meltdown? The Top 25 Subprime Lenders and Their Wall Street Backers, available at http://www.publicintegrity.org/investigations/economic_meltdown/the_subprime_25/.

generated by subprime mortgages, these mortgages would feed the banks' own securitization business.

21.   The wave of mergers consolidated economic and political power in a handful of megabanks, among them Citigroup, Bank of America, J.P. Morgan, Chase, First Union, and Wells Fargo. The passage of the Gramm-Leach-Bliley Act in 1999 meant that investment banking – including buying, selling, trading mortgage-backed securities – was now given a government bail-out guarantee previously only given to traditional banks.

22.   The term "too big to fail" ("TBTF") refers to certain financial institutions that are so large and interconnected that they cannot be allowed to go into uncontrolled bankruptcy; defaulting on their obligations will create significant losses for other financial institutions, potentially triggering a domino effect that causes the entire financial system to collapse.[4]

23.   What makes a financial institution too big to fail is the amount of collateral damage that its uncontrolled failure could cause.  This damage can take several different forms.  A

---

[4] For example, the bankruptcy of Lehman Brothers ("Lehman") in September 2008 accelerated the collapse of American International Group ("AIG"), forcing it to rely on funds from the Federal Reserve.  Lehman's failure also caused a sudden loss of confidence in all money market funds; in turn, the flood of money out of the money market funds cause the commercial paper market to freeze, thus endangering the ability of many

failing institution could have thousands of open transactions with counterparties, which are largely other financial institutions.[5] A failing bank may have sold credit default swap ("CDS") protection on various securities; its counterparties are assuming that they are perfectly hedged because of those swaps. However, when the bank fails, suddenly those hedges disappear and the counterparties are forced to take large losses on the underlying securities.

24. Beyond the collateral damage that large interconnected financial institutions inflict on the financial system, TBTF institutions create significant problems for society as a whole.

25. First, when TBTF institutions come to the brink of failure, they have to be bailed out, usually by the government (and taxpayers). A TBTF bank cannot be allowed to go into ordinary bankruptcy procedure because its creditors and counterparties would be cut off from their money supply for months, which could be fatal. This means that government must keep failing banks afloat and, without a credit threat of bankruptcy to negotiate with, must honor all of the bank's obligations; in other words, the money the bank lost has to be made up with public funds. This "hidden subsidy" has been

corporations to operate on a day-to-day basis. The sequence of failures was only stopped by massive government rescue measures.

calculated to be worth approximately $34 billion for 18 large banks in 2009, accounting for roughly half of their profits.[6]

26.  All banks are highly leveraged, which means that they are betting with other people's money.  There are many strategies – of which, securitization is the most popular – that increase returns for shareholders (and executives) while shifting potential losses onto someone else. TBTF institutions have a strong incentive to take excessive risk, since the government effectively guarantees their losses in an emergency. This sets up a situation where the market's checks and balances do not operate to curb excessive risk taking. Because creditors are aware that the government will not let these banks fail by guaranteeing their losses, they continue to invest.

27.  Arguably most significant problem for society is that TBTF banks stifle competition and therefore are bad for the economy.  Because large "megabanks" have an implicit government guarantee, bond investors are willing to lend them money at lower interest rates than offered to their smaller competitors. This subsidy makes it harder for smaller banks to compete,

---

[5]   For example, at the time of its collapse, the face value of AIG's open derivatives contracts was $2.7 trillion – $1 trillion of it was held by only twelve financial institutions.
[6] Simon Johnson and James Kwak, 13 Bankers, at p. 205, citing Dean Baker and Travis McArthur, "The Value of the 'Too Big to Fail' Big Bank Subsidy," Center for Economic and Policy Research Issue Brief, September 2009, available at

deterring new entrants and only strengthening the long-term process of consolidation and concentration in the financial sector. To wit, large banks paid .78 percentage points less for money than smaller banks in the wake of the financial crisis[7], resulting in a huge competitive advantage and consolidating their stranglehold on the economy.

28.   By 2008, the big banks became bigger. Bank of America bought Countrywide. Merrill Lynch's assets grew from $1.7 trillion to $2.3 trillion – from 2007 to 2009. JPMorgan Chase absorbed Bear Stearns and Washington Mutual grew from $1.6 to $2 trillion. JPMorgan Chase, Bank of America, and Wells Fargo had to be exempted from a federal rule prohibiting a single bank from holding more than 10% of all deposits in the U.S. They were also exempted from Dept. of Justice antitrust guidelines intended to limit monopoly power in specific metropolitan regions. By 2009, these three banks controlled half the market for new mortgages.[8]

29.   At present, there are at least six banks that are considered too big to fail – Bank of America, Citigroup, Goldman Sachs, JPMorgan Chase, Morgan Stanley, and Wells Fargo.   Of these six megabanks, four – Bank of America, Wells Fargo,

---

http://www.cepr.net/documents/publications/too-big-to-fail-2009-09.pdf.

[7] Simon Johnson, 13 Bankers, Id. at 205.

[8] Simon Johnson, 13 Bankers. Id., at 180.

Citigroup and JPMorgan Chase – maintain over 63% of the market share for mortgage originations.

## STATEMENT OF FACTS RELEVANT TO ALL CLAIMS

30.   The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

31.   On or about January 22, 2007, the PANLASIGUIS executed a mortgage in favor of BOA (the Mortgage), secured by real property located at 57 Piina Place, Lahaina, Hawaii, TMK # 2-4-3-009-070-0000 (the Subject Property), and recorded in the State of Hawaii Bureau of Conveyances, as Document No. 2007-017109.  A copy of the mortgage is attached, marked Exhibit A, and incorporated by reference.

32.   The PANLASIGUIS also executed a Promissory Note (the Note) in the principal amount of $780,000, on or about January 19, 2007. At the time of execution, Note was secured by the Mortgage on the Subject Property.

33.   The PANLASIGUIS placed their trust and confidence in BOA to properly qualify them for the loans and to provide them with the most favorable loan program and loan terms and felt BOA would look out for their best interest in meeting their mortgage needs.

34.   Plaintiffs followed all of BOA's instructions and submitted all documentation requested by BOA. The PANLASIGUIS

felt that BOA had a fiduciary obligation to them to protect their interests and maintain their privacy.

35.   BOA required an appraisal of the PANLASIGUIS' property as part of the loan application process which Plaintiffs paid for in the closing costs.   The PANLASIGUIS relied upon the accuracy of BOA's appraisal in making their decision to pledge the Subject Property.

36.   The PANLASIGUIS were not provided with time to review the loan application or other associated documents prior to the loan's "closing" or signing of the mortgage documents.

37.   The PANLASIGUIS were not afforded the opportunity to have their legal counsel review the detailed documents.

38.   The PANLASIGUIS were not informed by BOA that it was treating the loan application as a subprime loan, that it intended to qualify the PANLASIGUIS based upon stated income and stated assets, that it would not be and was not conforming to usual and customary underwriting guidelines, and that by doing so, it would both increase the PANLASIGUIS' opportunity to qualify for a loan and increase the PANLASIGUIS' likelihood of defaulting in the continued payment of any obligation under the Note resulting in foreclosure and loss of the Subject Property.

39.   Due to BOA's failure to make the above referenced disclosures, among others, the PANLASIGUIS did not understand

the true terms of the loan being proposed and were unable to compare the loan with loan terms from other lenders.

40. BOA failed to properly qualify Plaintiffs as being able to afford the loan payments amortized over the life of the loan.

41. BOA failed to inform Plaintiffs and explain in any meaningful way that Plaintiffs could compare terms or might qualify for a better loan program offered by Defendant.

42. BOA failed to inform Plaintiffs that by failing to follow generally accepted underwriting guidelines in qualifying Plaintiffs for the loan that it was likely that Plaintiffs would default and lose their interest in the Property.

43. Plaintiffs made payments on the loan from their monthly income, savings, and cash advances on credit cards, and experienced significant financial hardship due to having to pay for a loan that they were not properly qualified for under usual and generally accepted underwriting guidelines.

44. In or about the fall of 2009, the PANLASIGUIS experienced loan distress and asked BOA for assistance in modifying or refinancing the loan.

45. BOA responded with a modification that essentially added the PANLASIGUI's missed payments to the principal on the note and allowed them to continue making payments.

46.   The PANLASIGUIS complied with every demand and requirement of BOA and attempted to make the payments under the modification.

47.   On or about December 9, 2010, BOA caused a Notice of Mortgagee's Intention to Foreclose Under Power of Sale (the Notice), listing BOA as Mortgagee, to be recorded with the Hawaii Bureau of Conveyances as Document No. 2009-190380. A copy of the Notice is attached, marked Exhibit B, and incorporated by reference.

48.   Should BOA be allowed to proceed with foreclosure on the Subject Property, the PANLASIGUIS will be irreparably harmed, in that they will be unlawfully deprived of possession of their property for whatever period of time it takes for them to regain such possession.  Such loss of possession, being one of the "sticks" in the bundle of rights attendant to the ownership of property, cannot be fully compensated with money, as all real property is unique.

### LEGAL FRAMEWORK AND FACTS COMMON TO PLAINTIFF'S CLAIMS FOR VIOLATION OF FEDERAL AND HAWAII ANTI-TRUST STATUTES

49.   The substantive provisions of the Sherman, Clayton, and Federal Trade Commission Acts were incorporated verbatim into Hawaii anti-trust law; therefore, interpretation of Hawaii's anti-trust statutes is "in accordance with judicial interpretations of similar federal antitrust statutes," and

courts may address the federal and state claims together, rather than separately. HRS § 480-3. See, e.g., *State v. Gannet Pac. Corp.*, 99 F.Supp.2d 1241, 1248 n.7 (D. Haw. 1999) ("[T]he Court need not address the sate law claims separately because they essentially mirror the federal claims" of "restraint of trade, conspiracy to monopolize, and attempted monopolization.") (citing *Robert's Haw. Sch. Bus, Inc., v. Laupahoehoe Transp. Co.*, 982 P.2d 853 (Haw. 1999), noting that the legislature followed the "federal paradigm" in fashioning Hawaii antitrust law.).

50. Any person injured in his business or property due to a violation of the Hawaii Anti-Trust Act may sue for damages under §480-13(a). Standing applies to consumers, and is not limited to alleging commercial or competitive injury. The essential elements of a private action under HRS 480-2 are: "(1) a violation of Chapter 480; (2) injury to the plaintiff's business or property resulting from such violation; (3) proof of the amount of damages; and (4) a showing that the action is in the public interest or that the defendant is a merchant." Ai v Frank Huff-Agency, 607 P.2d 1304, 1311 (Haw. 1980), overruled on other grounds by *Robert's Haw. Sch. Bus, Inc. v. Laupahoehoe Transp. Co.*, Id.

51. As to the fourth element, Plaintiff submits that the named Defendants are both "merchants" and also that this claim is brought in the public interest.

> "[T]o justify filing a complaint the public interest must be specific and substantial. Often it is so, because the unfair method employed threatens the existence of present or potential competition. **Sometimes, because the unfair method is being employed under circumstances which involve flagrant oppression of the weak by the strong.** Sometimes, because, although the aggregate of the loss entailed may be so serious and widespread as to make the mater one of public consequence, no private suit would be brought to stop the nfair conduct, since the loss to each of the individuals affected is too small to warrant it." *Ai*, Id. at 1310, quoting *FTC v. Klesner*, 280 U.S. 19, 28 (1929).

52. Hawaii Courts have followed federal law when defining the terms "unfair" and "deceptive" in HRS §480-2.

> "A practice is unfair when it offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. Dubin v. Wakuzawa, 970 P.2d 496, 505 (Haw. 1999)(quoting Eastern Star, Inc. v. Union Bldg. Materials Corp., 712 P.2d 1148, 1154 (Haw. 1985) (quoting Rosa v. Johnson, 651 P.2d 1228, 1234 (Haw. Ct. App. 1982)); Spiegel, Inc., v. FTC, 540 F.2d 287, 293 (7th Cir. 1976)).

> Deception is "an act causing as a natural and probable result, a peson to do that which he would not otherwise do." Dubin v. Wakuzawa, Id. at 505, (quoting Eastern Star, Inc., Id. (citing Bockenstette v. FTC, 134 F.2d 369 (10th Cir. 1943)). See also Hawaii Comty. Fed. Credit Union v. Keka, 11 P.3d 1, 16-17 (Haw. 2000).

53. Deceptive acts or practices are distinct from unfair acts or practices, both in how they are defined and in the

standard by which they are proved. *State v. United States Steel Corp*, 919 P.2d 294, 313 (Haw. 1996). Actual deception need not be show; the capacity to deceive is sufficient. Eastern Star, Inc., 712 P.2d at 1154(citing Goodman v. FTC, 244 F.2d 584 (9th Cir. 1957)); see also Hawaii Community Fed. Credit Union, Id.; Dubin, Id., citing Eastern Star, Inc., Id.).

54. Monopolization is prohibited by HRS § 480-9, which is taken from the Sherman Act, 15 U.S.C. § 2. The Hawaii Supreme Court, in *Island Tobacco I,* stated: "The offence of monopoly under Section 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Island Tobacco Co. v. R.J. Reynolds Tobacco Co., 627 P.2d 260, 274 (Haw. 1981) (quoting U.S. v. Grinnell Corp., 384 U.S. 563, 570-571, overruled on other grounds by Robert's Haw.Sch.Bus, Inc., v. Laupahoehoe Transp. Co., Id.).

55. In *Island Tobacco II,* the federal court identified the elements of an "Attempt to monopolize" claim as involving "(1) a specific intent to control prices or destroy competition with respect to a part of commerce; (2) predatory conduct directed toward accomplishing the unlawful purpose; (3) a dangerous probability of success." Below-cost pricing may prove the

specific intent and dangerous probability of success elements. Island Tobacco Co. V. R.J. Reynolds, 513 F.Supp. 726 (D. Haw. 1981).

### CLAIM I
### VIOLATIONS OF THE SHERMAN/CLAYTON ANTI-TRUST ACT

56.   The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

57.   The PANLASIGUIS are informed and believe and on that basis allege that BOA, along with six large private banking institutions operating within the United States sued as DOES 1-5 (collectively "the Big Six"), agreed, beginning in or about 1994, to a scheme by which they would and did set up a private system of recording interests in land in the United States, that would give them a competitive advantage over smaller banking institutions to transfer mortgage loans freely into securitized pools of like mortgages; this system became Defendant MERS.

58.   The PANLASIGUIS are further informed and believe and on that basis allege that subsequent to the creation of MERS, the Big Six used their combined market power in the financial industry to take control of the market for private securitization of mortgages, to the virtual exclusion of smaller banking institutions, such that virtually all privately securitized mortgage loans are in trust to or serviced by the Big Six

59.   The PANLASIGUIS are further informed and believe and on that basis allege that subsequent to the creation of MERS, the Big Six were able to and did control the administration and servicing of virtually all private securitization of pooled mortgages and the capital they generated, such that other smaller banking institutions of the United States have been virtually "shut out" from private sources of capital for funding residential mortgage loans, unless they were willing to join into the MERS system, and sell the mortgages they originated into the mortgage pools set up and controlled by the Big Six, such that those institutions are denied the benefits of the interest generated by such mortgages and the income generated from servicing those mortgages.

60.   The PANLASIGUIS are further informed and believe and on that basis allege that subsequent to the creation of MERS, smaller banking institutions in the United States have been forced out of the residential lending market, and instead were forced to engage in much more speculative forms of lending, such as construction and development loans to builders, and small to medium sized commercial and industrial real estate loans.

61.   The PANLASIGUIS are further informed and believe and on that basis allege that subsequent to the creation of MERS, the Big Six and MERS used their control over the residential mortgage market by inflating the market for residential

properties in the United States and thereby increasing the proportionally-based fees that such larger loans would generate.

62.  Such inflation manifested itself in a complete inversion of the order of mortgage loan creation and securitization.  The Big Six's desire for more profit led to a system in which a security instrument would be created and marketed to investors prior to any loan being originated.  The security would be tailored to consist of mortgages of certain specified sizes, features, and risk levels.  It would be only after the security was sold to investors with "place holder" and "bogus" assets that the Big Six would send out "orders" for mortgage loans that met the criteria set forth in the security's prospectus.

63.  The "orders" would then be transmitted to loan originators, whether they were units or subsidiaries the Big Six or independent brokers.  The originators would be "encouraged" to make loans of the type specified in the orders, since those loans were the ones most likely to be purchased and securitized.

64.  The originators would then be under pressure to make such loans to their customers, regardless of the customers' needs.  Given that the Big Six virtually controlled the market in loans, those originators would steer customers toward those loans, and either fail to mention or steer customers away from loans that might be otherwise more appropriate.

65.   Because larger loans generated larger fees, the
originators would steer customers toward larger loans, whether
or not such larger loans were within the customers' means.

66.   In order to facilitate the granting of larger loans,
the Big Six developed loan products that did not depend on proof
of a borrower's income, but rather depended on the value of the
real property secured by the loans.

67.   In order to justify the granting of larger loans,
pressure was brought to bear upon property appraisers: those who
would not "hit the number" (appraise a property at a value that
the lender wanted to lend) would not be given further business.

68.   As the result of the acts described above, the Big Six
were able to increase the size of loans they made, bought, and
securitized, allowing them to take their gains and redeploy them
into even larger securities, and in the process were able to
inflate the prices of residential real property to a point where
they were far beyond the means of the purchasers to whom they
were readily giving loans, according to the lending standards
they themselves had developed and used for decades.

69.   The PANLASIGUIS are further informed and believe and
on that basis allege that the Big Six knew that such a business
that depended upon ever increasing real estate values was
unsustainable, and purposely created and used MERS to serve as a

"firewall" between themselves, the loan originators, and the borrowers they were routinely pulling into unsustainable debt.

70. The PANLASIGUIS are further informed and believe and on that basis allege that the Big Six also depended upon MERS to give them a quick and efficient way of rationalizing the interests they would need to secure interests in the real property, whether or not such rationalizations reflected the true relationship between lender and borrower, once their scheme of inflating prices reached its natural and inevitable point of saturation, real estate prices began to fall, and borrowers fell into financial distress.

71. The PANLASIGUIS are informed and believe, and on that basis allege that the Big Six also created securities generally known as credit default swaps (CDSs), in which they took positions against the mortgage securities they created, in effect betting against the very home loan borrowers they had sought to entice into loans on constantly appreciating residential real property, knowing that those borrowers would eventually be unable to meet those inflated obligations that the Big Six had endeavored to create.

72. The PANLASIGUIS are informed and believed, and on that basis allege, that GMAC, (a) knew of and acquiesced to the creation of MERS by the Big Six, and actively used MERS to facilitate the creation of its own mortgage loan securities, and

(b) knew of the acts of the Big Six described above in inflating the mortgage market, and knowingly and willfully accepted the benefits of such an inflated market in the form of increased fees for servicing residential mortgage loans and residential mortgage securities.

73.   The PANLASIGUIS are informed and believe, and on that basis allege that GMAC agreed to include MERS as mortgagee and "nominee" for the Mortgage as part of an agreement between GMAC as a "member" of MERS, MERS itself, and the Big Six, sued here as DOES 1-6, inclusive, to (a) protect and insulate GMAC from otherwise valid claims and defenses by mortgagors and borrowers by providing an intermediary in the transaction; (b) provide a conduit for the securitization, and exclusive access to the business of servicing securitized mortgage loans and DOE Defendants 1-6; and (c) eliminate competition in the real residential loan industry in that consumers are offered only loans that conform to the preset parameters of securitization pools, and cannot obtain loans that more closely fit their particular needs.

74.   Defendants' conduct, as described above violates the Sherman Anti-Trust Act, 15 U.S.C. §§ 1 and 2.

75.   As the result of the conduct of GMAC, MERS, and DOES 1-5 described above, The PANLASIGUIS have been damaged, in that they have been subject to the imposition of artificially high

mortgage rates and fees for mortgage servicing, without any

meaningful choice, and without any opportunity to bargain for

more advantageous fees, such fees being added to any balance due

to the mortgagee in the event of default, all inconsistent with

a system of free and fair trade guaranteed to all persons, and

the restraint of which is prohibited by the Sherman and Clayton

Anti-Trust Acts, 15 U.S.C. § 2 et seq.

76.   Section 4 of the Clayton Antitrust Act, codified at 15

U.S.C. §15, provides as follows:

> [A]ny person who shall be injured in their business or
> property by reason of anything forbidden in the antitrust
> laws may sue therefor in any district court of the United
> States in the district in which the defendant resides or is
> found or has an agent, without respect to the amount in
> controversy, and shall recover threefold the damages by him
> sustained, and the cost of suit, including a reasonable
> attorney's fee.

The PANLASIGUIS allege that because of defendants'

violations of 15 U.S.C. § 2 et seq., as set forth above, they

are such persons injured in their property, and are therefore

entitled to bring an action against Defendants for Defendants'

actions complained of above.

77.   As a direct and proximate result of the unlawful

conduct of  GMAC, MERS, DOES 1-6, and each of them, in

monopolizing or attempting to monopolize the mortgage lending

and servicing market, The PANLASIGUIS have suffered pecuniary

damages in an amount to be determined, and subject to treble augmentation.

78.   Plaintiffs have also been required to retain legal counsel and therefore request that the defendants be required to pay Plaintiffs' attorney fees and costs necessary to pursue their legal and just claims, pursuant to 15 U.S.C. §15.

**CLAIM II**
**VIOLATIONS OF THE HAWAII ANTI-TRUST/ANTI-MONOPOLY ACTS**

79.   The allegations contained in the preceding paragraphs of this Counterclaim are incorporated herein by reference.

80.   Mortgage lending and servicing in Hawaii is an activity in or affecting interstate commerce under Section 2 of the Sherman Act, as the parties traffic in personal service to foreigners and rely on foreign goods for their businesses.

81.   The conduct of Defendants as described more fully above violates the Hawaii Monopolization Act, Hawaii Revised Statutes § 480-9.

82.   As a direct and proximate result of the unlawful conduct of Defendants, and each of them, in monopolizing or attempting to monopolize the mortgage lending and servicing market, Plaintiffs have suffered pecuniary damages in an amount to be determined at trial.

83.   Plaintiffs have also been required to retain legal counsel and therefore request that the defendants be required to pay Plaintiffs' attorney fees and costs necessary to pursue their legal and just claims, pursuant to Hawaii Revised Statutes § 480-9.

## CLAIM III
### UNFAIR AND DECEPTIVE ACTS OR PRACTICES

84.   The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

85.   Plaintiffs are "consumers" as that term is defined in HRS § 480-1.

86.   The described acts and practices of making and servicing mortgage loans involved "trade or commerce" as that term is used in HRS § 480-2(a).

87.   An unfair or deceptive act or practice (UDAP) in the conduct of any trade or commerce is unlawful pursuant to HRS § 480-2(a).

88.   Certain deceptive trade practices are also unlawful pursuant to HRS §481A-3.

89.   In connection with the subject loan, Defendants engaged in UDAPs that violate HRS § 480-2(a) and/or 481A-3, including but not limited to:

a.  Targeting financially unsophisticated and otherwise vulnerable consumers for inappropriate credit products;

b.  Failing to adequately disclose the true costs and risks of the subject loan and its/their inappropriateness for Plaintiff;

c.  Failing to disclose that lender approved the subject loan based on financial documents required by Defendants such as Plaintiff's tax returns and pay stubs without regard to Plaintiff's ability to sustain the loan with any reasonable means test;

d.  Falsely representing or failing to fully and completely disclose the amounts Plaintiff were required to pay;

e.  Making a defective mortgage loan or loans that resulted in little net economic benefit to Plaintiff with the primary objective of generating fees.

90.  Defendants' actions in connection with the subject loan constitute UDAPs in violation of HRS §§ 480-2(a) and/or 481A-3.

91.   Defendants' conduct caused Plaintiff to suffer injury to his property, including without limitation wrongfully induced payment of money.

92.   Defendants' described acts and practices offend established public policy and were immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers, and were therefore unfair in violation of HRS § 480-2(a).

93.   Defendants' described acts and practices involved material representations, omissions or practices that were likely to mislead consumers acting reasonably under the circumstances, and were therefore deceptive in violation of HRS §§ 480-2(a), 481A-3 and 454M, or all of them.

94.   Pursuant to HRS § 480-12, a contract or agreement in violation of HRS Chapter 480 is void and is not enforceable at law or in equity.  Plaintiffs thus seek rescission of the loan contract.

95.   In the alternative, as the direct and proximate result of Defendants' acts or omissions, Plaintiffs have been damaged in an amount to be established at trial.

96.   Plaintiffs have also been required to retain legal counsel and therefore request that the defendants be required to pay Plaintiffs' attorney fees and costs necessary to pursue

their legal and just claims, pursuant to Hawaii Revised Statutes § 480-9.

## CLAIM IV
### BREACH OF FIDUCIARY DUTY

97. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

98. BOA, by contracting to, and representing it would provide mortgage loan services and a loan to the PANLASIGUIS which they understood was not only meant to be best suited to his needs given his income and expenses but also would allow him to satisfy his obligations without risk of losing his property, was a "fiduciary" in which the PANLASIGUIS reposed trust and confidence, especially given that he was and is not an investment banker, securities dealer, mortgage lender, mortgage broker, or mortgage lender.

99. BOA, breached its fiduciary duties to the PANLASIGUIS by fraudulently inducing the PANLASIGUIS to enter into a mortgage transaction which was contrary to the PANLASIGUIS' stated intentions and interests.

100. As a direct and proximate result of Defendants' breaches of fiduciary, the PANLASIGUIS are entitled to rescission of the transaction, and damages in an amount to be established at trial.

101. Under the totality of the circumstances, the Defendants' actions were willful, wanton, intentional, and undertaken with the conscious disregard for the Plaintiff's rights.  Such actions warrant an award of exemplary damages to both punish and make an example of the defendant as to other persons or entities with similar inclinations.

## CLAIM V
## UNJUST ENRICHMENT

102. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

103. BOA had an implied contract and warranty with Plaintiff to ensure that the Plaintiff understood all fees, rates, payments and charges which would be paid to BOA or its successors in interest, to obtain credit on Plaintiff's behalf, to not charge any fees which are not related to the settlement of the loan, and to disclose to Plaintiff that the loan products together would provide a 30-year mortgage designed specifically with the Plaintiff's known personal financial information required by BOA.

104. BOA, failed and refused, and continues to fail and refuse to honor the warranties set forth above.

105. BOA cannot, in good conscience and equity, retain the benefits from its actions of charging a higher interest rate, fees, rebates, kickbacks, profits and gains from any resale of

mortgages and notes using Plaintiff's identity, credit score, income, appraisal and reputation without consent, right, justification or excuse as part of an illegal enterprise scheme.

106. BOA has been unjustly enriched at the expense of the Plaintiffs and maintenance of the enrichment would be contrary to the rules and principles of equity.  Plaintiff thus demands restitution from the Defendant BOA in the form of actual damages to be proven at the trial on this matter.

**CLAIM VI**
**INJUNCTIVE RELIEF**

107. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

108. Plaintiffs are informed and believe that Defendant Boa intends to foreclose upon the Subject Property as soon as possible, consistent with the Notice filed with the Hawaii Bureau of Conveyances on December 9, 2010.

109. Plaintiffs have alleged facts that demonstrate a likelihood that Plaintiffs will succeed on the merits of their claims set forth in this Complaint.

110. Plaintiffs further allege that should BOA follow through with its stated intention to foreclose upon the Subject Property, that they will suffer irreparable harm, including, but not limited to loss of their rights to rescind the loan transaction, loss of the use of the Subject Property, and loss

of the right to exclude others from entering, making use of, or removing things of value from the Subject Property.

111. Plaintiffs further allege that the balance of hardships as between Defendant BOA and them falls firmly and unequivocally in their favor, in that Plaintiffs depend on the Subject Property as their home, while Defendant BOA is a large business organization with ample assets upon which to depend, and no interest in the Subject Property beyond selling it to a third party.

112. Plaintiffs therefore seek an order from the Court enjoining Defendant BOA from foreclosing upon the Subject Property pursuant to any alleged power of sale, pending the resolution of this action, whether by judgment of the Court or mutually agreed settlement made between all of the parties to this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand Judgment against Defendants, as follows:

AS TO THE SIXTH CAUSE OF ACTION:

For an order enjoining Defendant BOA from foreclosing upon the Subject Property pursuant to any alleged power of sale, pending the resolution of this action, whether by judgment

of the Court or mutually agreed settlement made between all of the parties to this action.

AS TO THE THIRD AND FOURTH CAUSES OF ACTION:

For a judgment of rescission of the Mortgage.

AS TO THE FIRST, SECOND, AND THIRD CAUSES OF ACTION:

For a judgment awarding statutory damages in such amounts as shall be established at the time of trial.

AS TO THE THIRD, FOURTH CAUSE OF ACTION:

For a judgment awarding exemplary damages in such amounts as shall be proven at the time of trial.

AS TO THE FIRST, SECOND, AND THIRD CAUSE OF ACTION:

For a judgment awarding reasonable attorney's fees according to proof.

AS TO THE FIRST THROUGH FIFTH INCLUSIVE, CAUSES OF ACTION:

For a judgment awarding compensatory damages in such amounts as shall be proven at time of trial.

AS TO ALL CAUSES OF ACTION:

1.   For costs of suit incurred; and

1.   For such other and further relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs, and each of them, hereby demand trial by jury on all issues triable by right to a jury.

Dated this _March 9_____, 2011, at Wailuku,

Hawaii.

> IVEY FOSBINDER FOSBINDER LLLC
> A LIMITED LIABILITY LAW COMPANY
>
>
> JAMES H. FOSBINDER
> *Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ANTONIO PANLASIGUI and LEE-ANN PANLASIGUI,<br><br>                              Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA, N.A. and DOES 1 through 20 inclusive,<br><br>                              Defendants. | Civil No.<br>SUMMONS |

## SUMMONS

### Summons in a Civil Action

**TO THE ABOVE NAMED DEFENDANTS:**

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Federal Rules of Civil Procedure Rules 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address is:

James H. Fosbinder
IVEY FOSBINDER FOSBINDER LLLC
1883 Mill Street

1

Wailuku, Hawaii  96793
Telephone:  (808)242-4956

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

This summons shall not be personally delivered between 10:00 p.m. and 6:00 a.m. on premises not open to the general public, unless a judge of the above-entitled court permits, in writing on this summons, personal delivery during those hours.

CLERK OF COURT        SUE BEITIA

Date: MAR 10 2011

_____
Signature of Clerk or Deputy Clerk